IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

BRANDON WALTON,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
ALEXANDER JAMSA, and
CASEY MEYER,

Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Brandon Walton, by and through his attorneys at the Civil Rights Litigation Group, hereby submits this Complaint and Jury Demand, alleging as follows:

## INTRODUCTION

Mr. Walton brings this civil rights action seeking justice after being pummeled three times, unnecessarily, by a Denver Deputy Sheriff, while he lay in a hospital bed seeking medical care and suffering involuntary and non-threatening muscle spasms in front of the deputies.

The two Defendant deputies brought Mr. Walton to Denver Health after he inadvertently disconnected his catheter from its bag while in an altered mental state at the Denver Detention Center. At the time, Mr. Walton was being held at the Denver Detention Center after he experienced a significant mental health episode that resulted in him walking in and out of apartments that were not his, in his apartment building, and—

1

ultimately—his being arrested without incident for his actions.

When Mr. Walton was waiting to be discharged from the Denver Health Medical Center back to the downtown Denver Detention Center, he experienced muscle contractions that caused his limbs to involuntarily flail into the air. These spasms were clearly involuntary and were not controlled in any apparent manner. They certainly did not evidence an intentional attempt to harm anyone and could not have been reasonably viewed as an attempt to threaten or assault another person. Yet, one of the two deputy sheriffs who stood guard over the room immediately responded by striking Mr. Walton in the face—without warning—three times. The other deputy sheriff was present and in close proximity to see and hear the violence but failed to step in to intervene or stop the unprovoked violence.

The two Defendant deputies sought to avoid accountability by failing to activate or submit body-worn camera videos of the incident, failing to document the use of force as required by DSD policy, and failing to otherwise report the violent overreaction to anyone. Given Mr. Walton's physical and mental health condition, they may have gotten away with it if not for reports from medical professionals at Denver Health, which show that Mr. Walton entered the hospital with his face in tact but left it disfigured following an interaction with the deputies in the room.

The Defendants' conduct broke Mr. Walton's nose, gave him a concussion, and—to this day—has left him with difficulty breathing through his still misshapen nose that will require surgery to fix. Mr. Walton also regularly experiences flashbacks of the traumatic incident, indicative of significant emotional distress. Mr. Walton seeks

compensation for physical and emotional harm, pain and suffering, and economic damages, as well as punitive sanctions against the deputies to punish and deter their blatant abuse of authority and violation of Mr. Walton's rights.

## JURISDICTION AND VENUE

1. Plaintiff's federal claim is brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.

2. Plaintiff's state law claim is brought pursuant to C.R.S. § 13-21-131 and Article II, Section 7 of the Colorado Constitution.

3. This Court has subject matter jurisdiction over the federal claim pursuant to 28 U.S.C. § 1331.

4. This Court has supplemental subject matter jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

5. Venue is proper in the District of Colorado, pursuant to 28 U.S.C. § 1391(b) because all the events alleged herein and which give rise to this action occurred in the State of Colorado

6. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1998 and C.R.S. § 13-21-131(3).

## PARTIES

7. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

8. Plaintiff Brandon Walton was at all times relevant to the claims set forth herein a resident of the State of Colorado.

3

9. Defendant Casey Meyer was, at all times relevant to this Complaint, employed as a deputy sheriff by the City and County of Denver, Colorado, and acted under color of state law. He is identified in his individual capacity.

10. Defendant Alexander Jamsa was, at all times relevant to this Complaint, employed as a deputy sheriff by the City and County of Denver, Colorado, and acted under color of state law. He is identified in his individual capacity.

11. Defendant City and County of Denver ("Denver") is a municipal corporation within the State of Colorado. At all times relevant to this Complaint, it employed and was responsible for training and supervision of Defendants Meyer and Jamsa.

## FACTUAL BACKGROUND

12. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

13. On December 30, 2022, Mr. Walton was found behaving strangely: trying to enter apartments that were not his own, in the same apartment complex that Mr. Walton lived in. Residents of these other apartments called 911, and officers from the Denver Sheriff Department ("DSD") responded.

14. DSD officers arrested Mr. Walton without incident.

15. Recognizing that Mr. Walton was clearly experiencing some kind of mental health issue, DSD officers called an ambulance and had medical professionals evaluate and ultimately transport Mr. Walton to Denver Health Medical Center ("Denver

4

Health").

16. Medical professionals at Denver Health observed Mr. Walton for several hours, placing a catheter and noting suspected psychosis, before releasing him into DSD custody at approximately 11:30 a.m. on December 31, 2022.

17. DSD held then Mr. Walton in a medical unit at the Van Cise-Simonet Detention Center in downtown Denver ("the Detention Center").

18. Less than twenty-four hours later, early in the morning on January 1, 2023, DSD staff transported Mr. Walton to Denver Health due to an issue with his catheter.[1]

19. Mr. Walton arrived at Denver Health's Emergency Department at approximately 3:29 a.m. He was still experiencing an altered mental state.

20. Hospital personnel quickly assessed and remedied the issue with Mr. Walton's catheter.

21. Defendants Meyer and Jamsa were at Mr. Walton's bedside to watch him and eventually transport him back to the Detention Center.

22. Mr. Walton had fallen asleep in the hospital bed, and at approximately 4:47 a.m., he awoke suddenly, disoriented.

23. He did not know where he was or what was going on.

24. Mr. Walton tried to get up from his hospital bed, but his muscles did not

---

[1] DSD staff believed Mr. Walton had removed the catheter from his body, but hospital staff later dertmined that the catheter was still in place, it had just become disconnected from its bag.

5

move as directed, and he began to spasm uncontrollably, causing his limbs to flail in the air.

25. The spasming limbs did not come close to anyone near.

26. The spasming was involuntary and did not appear to be controlled.

27. The spasming did not appear to be an intentional effort to threaten or cause harm to anyone.

28. Mr. Walton did not hit, kick, or strike anyone.

29. Mr. Walton was not intending to hit, kick, or strike anyone.

30. Nor did Mr. Walton attempt to resist or evade any type of arrest, seizure, or movement initiated by the Defendant deputies.

31. No reasonable officer viewing the involuntary movements could reasonably view them as attempts to harm or assault anyone.

32. Mr. Walton was clearly experiencing some sort of physical or psychiatric medical issue.

33. Nevertheless, either Defendant Jasma or Defendant Meyer promptly punched Mr. Walton in the face—not just once, but three times—each punch harder than the last, as the other looked on.

34. Neither Defendant Meyer nor Defendant Jamsa gave Mr. Walton any verbal warnings or commands regarding his movements (nor the opportunity to comply with those commands or explain the involuntariness of his muscle spasms had they done so).

35.  Defendants did not first attempt to restrain Mr. Walton's movements in a less violent way than punching him in the face.

36.  Defendants did not make any attempt to understand, communicate regarding, or to de-escalate the situation to avoid or prevent the need for violence.

37.  Mr. Walton heard a snapping or cracking sound and felt excruciating pain as blood poured from his nose.

38.  Mr. Walton soon lost consciousness.

39.  At the time, any reasonable officer responsible for providing transport and watch duties for the Denver Sheriff Department should have been trained and supervised to understand that pretrial inmates brought to the hospital may be suffering similar health conditions and may experience involuntary spasms and/or movements that should not be interpreted as threats.

40.  Any reasonable officer in the Defendant deputies' shoes should have been provided appropriate training necessary to distinguish involuntary movements from voluntary ones.

41.  Any reasonable officer in the Defendant deputies' positions should have been provided appropriate training necessary to distinguish movements indicative of an imminent threat from those that were not.

42.  Proper training would have ensured that Defendants Meyer and Jamsa recognized the physical and/or mental health symptoms as a medical issue and not one requiring force.

43. Proper training would have ensured that the depuites did not misperceive Mr. Walton's medical condition(s) as criminal or threatening conduct requiring immediate and significant force.

44. Proper training would have provided officers with awareness of basic medical issues that could have obvious effects on an individual's conduct and whether that conduct is a medical reaction or an attempt to assault another person or flee from custody, would have educated Defendants Meyer and Jamsa to the fact that Mr. Walton's actions when he was in the hospital on January 1, 2023, was not conduct warranting the type of force that was ultimately used against him.

45. Mr. Walton's limbs spasming as a result of a physical or psychiatric medical issue does not provide justification for either forcefully punching him in the face three times or allowing a colleague to do so.

46. Denver did not provide the above-described training, education, or supervision to the Defendant officers.

47. It is obvious that such training is and was needed to prevent constitutional deprivations and that when officers are not trained to have basic awareness of these types of medical issues, officers are likely to misunderstand and misperceive such conduct.

48. Hospital staff reevaluated Mr. Walton after he was repeatedly punched and documented that Mr. Walton had blood on his face and a "new nasal deformity c/w [consistent with] a nasal bone fracture."

49. Mr. Walton was eventually discharged from Denver Health just prior to 6:00 a.m. on January 1, 2023, and transported back to the Detention Center.

50. Despite hospital staff noting an "altercation" between Defendants and Mr. Walton, neither Defendant Meyer nor Defendant Jamsa submitted body camera video of the incident.

51. Neither officer created or submitted a use-of-force report, incident report, or otherwise documented the incident or their actions regarding the incident.

52. The failure to submit body camera video or written reports is a violation of department policy.

53. Mr. Walton was released from DSD custody a couple weeks later, in mid-January 2023.

54. After being punched by Defendant Meyer or Jamsa, however, Mr. Walton was left suffering post-concussion symptoms, and, to this day, has trouble breathing through his nose.

55. Mr. Walton has received physical therapy for these issues, but his nose remains misshapen and would require surgery to be fixed.

56. Further, Mr. Walton is reminded of this traumatic incident every time he looks in the mirror. To this day, he experiences flashbacks and intrusive thoughts related to being punched while vulnerable and in a hospital bed, which evidences serious emotional distress that continues to haunt him.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fourth Amendment and C.R.S. § 13-21-131, Article II §7**

*Excessive Force and Failure to Intervene*
**(Defendant Meyer and Defendant Jamsa)**

57. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

58. Defendant Meyer or Defendant Jamsa intentionally and knowingly applied unnecessary, unreasonable, and excessive force against Mr. Walton by forcefully punching him in the face three times, breaking his nose and likely concussing him.

59. At the time this Defendant used force, Mr. Walton did not pose any threat to either of the Defendant deputies or anyone else.

60. At the time force was applied, Mr. Walton was not disobeying any commands or attempting to resist or evade the Defendant deputies' attempts to arrest, seize, or otherwise move him.

61. At the time of the use of force, Defendants Meyer and Jamsa failed to provide Mr. Walton with reasonable warnings or commands, or the opportunity to comply or otherwise respond to avoid the force.

62. At the time of the force, Mr. Walton was visibly unarmed and in DSD custody as a pretrial detainee after being charged with non-violent offenses related to a mental health episode.

63. Each of the Defendant deputies knew that Mr. Walton had been suffering from physical and/or mental health issues, and was not cogent or capable of causing intentional harm.

64. Less than twenty-four hours earlier, Mr. Walton was under observation at

Denver Health due to what other DSD officers and medical professionals recognized as an "altered mental status."

65. Having woken up disoriented in a hospital bed, still clearly experiencing an altered mental state, Mr. Walton was merely attempting to sit up and get his bearings when his musles began spasming, causing his limbs to rise into the air involuntarily.

66. No reasonable officer in the Defendant deputies' positions would believe he was attempting to harm anyone nor that it was necessary or appropriate to repeatedly and forcefully punch Mr. Walton in the face.

67. Nor would any reasonable officer in the Defendant deputies' positions simply stand by and let their colleague attack an individual in the manner that Mr. Walton was attacked.

68. It would have been obvious to any reasonable officer in these circumstances that repeatedly and forcefully punching Mr. Walton in the face exceeded the amount of force needed or lawfully permitted to carry out their duties.

69. Nevertheless, Defendant Jamsa or Defendant Meyer failed to intervene and prevent or stop the other's excessive use of force against Mr. Walton.

70. Defendants Meyer and Jamsa were objectively unreasonable when one repeatedly and forcefully punched Mr. Walton in the face and when the other failed to intervene.

71. The Defendant deputies also failed to document the incident and their involvement in it in any way (including, for example, by turning on their body-worn

cameras or writing or submitting a use-of-force report), despite the obvious use of force.

72. The Defendant deputies' actions were the proximate cause of Mr. Walton's injuries, including physical, emotional, economic, and dignitary harms.

73. The actions of Defendants Meyer and Jamsa, while acting under color of state law, deprived Mr. Walton of the rights, privileges, and liberties secured by the constitutions of both the United States of America and the State of Colorado, including the right to be free from unreasonable seizure as granted by the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constituion, made actionable pursuant to 42 U.S.C. § 1983 and C.R.S. 13-21-131, respectively.

### SECOND CLAIM FOR RELEIF
**42 U.S.C. § 1983, *Monell***
***Failure to Train and Supervise***
**(Defendant City and County of Denver)**

74. Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

75. On the morning of January 1, 2023, when Mr. Walton's limbs began to rise into the air and flail involuntarily, he was clearly experiencing a physical or psychiatric medical issue.

76. At the time, Mr. Walton had been checked into the hospital for the second time in just over two days (having been released the first time less than twenty-four hours prior)—the first time for exhibiting an altered mental state and the second time because DSD staff believed he had pulled out his catheter while experiencing a physical or mental health episode.

77. Mr. Walton was clearly unwell and was in an incoherent and vulnerable position.

78. He was clearly not any sort of immediate threat to those around him.

79. Nevertheless, Defendant Meyer or Defendant Jamsa failed to respond with the care necessary to address the medical condition. Instead of responding to the medical condition appropriately, one of the two immediately and unnecessarily punched Mr. Walton in the face three times when his limbs started spasming as he tried to get up, without any reasonable command or communication.

80. Defendant Jamsa or Defendant Meyer, evidently believing this was an appropriate course of action, stood by watching as the other struck Mr. Walton with enough force to break his nose and likely concuss him.

81. But this was obviously not the proper course of action.

82. Any reasonable officer responsible for providing transport and watch duties for the Denver Sheriff Department should have been trained and supervised to understand that pretrial inmates brought to the hospital may be suffering similar health conditions and may experience involuntary spasms and/or movements that are not to be interpreted as threats.

83. Any reasonable officer in the Defendant deputies' shoes should have been provided appropriate training necessary to distinguish involuntary movements from voluntary ones.

84. Any reasonable officer in the Defendant deputies' positions should have

been provided appropriate training necessary to distinguish movements indicative of an imminent threat from those that were not.

85.     Proper training would have ensured that Defendants Meyer and Jamsa recognized the physical and/or mental health symptoms as a medical issue and not one requiring force.

86.     Proper training would have ensured that the depuites did not misperceive Mr. Walton's medical condition(s) as criminal or threatening conduct requiring immediate and significant force.

87.     Proper training would have provided officers with awareness of basic medical issues that could have obvious effects on an individual's conduct and whether that conduct is a medical reaction or an attempt to assault another person or flee from custody, would have educated Defendants Meyer and Jamsa to the fact that Mr. Walton's actions when he was in the hospital on January 1, 2023, was not conduct warranting the type of force that was ultimately used against him.

88.     Mr. Walton's limbs spasming as a result of a physical or psychiatric medical issue does not provide justification for either forcefully punching him in the face three times or allowing a colleague to do so.

89.     Denver did not provide the above-described training, education, or supervision to the Defendant officers.

90.     It is obvious that such training is needed to prevent constitutional deprivations and that when officers are not trained to have basic awareness of these

types of medical issues, officers are likely to misunderstand and misperceive such conduct.

92. And this, in turn, makes it likely that those officers untrained on this issue will violate the constitutional rights of individuals experiencing various forms of medical distress.

92. Indeed, this failure by Defendant City and County of Denver deprived Mr. Walton of the rights, privileges, liberties, and immunities secured by the United States Constitution and caused him the above-described physical, emotional, dignitary, and economic harms. The City is thus a moving force behind the violation(s).

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against the Defendant for compensatory damages, punitive damages, interest as allowed by law, costs, expert witness fees, reasonable attorney fees as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court deems just and proper.

PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE

Respectfully submitted this 2nd day of January, 2025.

s/ *Raymond K. Bryant*
Raymond K. Bryant, No. 42586
Civil Rights Litigation Group
1543 Champa Street, Suite 400
Denver, Colorado 8020

P:  (720) 515-6165
F:  (720) 465-1975
raymond@rightslitigation.com
zach@rightslitigation.com

Case No. 1:25-cv-00015-SBP   Document 1   filed 01/02/25   USDC Colorado   pg 16 of 16